Michael A. Berta (SBN 196450)
(Michael.Berta@arnoldporter.com)
Isaac L. Ramsey (SBN 331142)
(Isaac.Ramsey@arnoldporter.com)
ARNOLD & PORTER KAYE SCHOLER LLP
3 Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone:  (415) 471-3100
Facsimile:  (415) 471-3400
*Counsel for Plaintiff Crocs, Inc.*

Thomas T. Carmack (SBN 229324)
(Thomas.Carmack@arnoldporter.com)
ARNOLD & PORTER KAYE SCHOLER LLP
3000 El Camino Real
Five Palo Alto Square, Suite 500
Palo Alto, CA 94306-3807
Telephone:  (650) 319-4500
Facsimile:  (650) 319-4700

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CROCS, INC.,<br><br>  Plaintiff,<br><br>  v.<br><br>LA MODISH BOUTIQUE, and LEGEND FOOTWEAR, INC. D/B/A WILD DIVA,<br><br>  Defendants. | Case No.<br><br>**PLAINTIFF CROCS, INC.'S COMPLAINT FOR TRADEMARK INFRINGEMENT, DILUTION, AND UNFAIR COMPETITION**<br><br>**JURY TRIAL DEMANDED** |

PLAINTIFF CROCS, INC.'S COMPLAINT

-1-

**CROCS, INC.'S**

**COMPLAINT FOR TRADEMARK INFRINGEMENT**

Plaintiff Crocs, Inc., through its undersigned counsel, brings the following Complaint against Defendants La Modish Boutique and Legend Footwear, Inc. d/b/a Wild Diva (collectively, "Defendants"), as follows:

**JURISDICTION AND VENUE**

1.     This is an action under Section 32(1) of the Lanham Act (15 U.S.C. § 1114(1)); Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); Section 43(c) of the Lanham Act (15 U.S.C. § 1125(c)); California Business and Professions Code § 17200; and California common law.

2.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338.

3.     This Court has pendent jurisdiction over the California statutory and common law claims pursuant to 28 U.S.C. § 1367 because the claims are so related to the other claims in the action over which the Court has original jurisdiction that they form part of the same case or controversy.

4.     This Court has personal jurisdiction over Defendant La Modish Boutique ("La Modish") because, on information and belief, La Modish Boutique has a principal place of business at 1773 W. San Bernardino Rd., Suite B25, West

Covina, CA 91790; conducts business in the judicial district; and has deliberately engaged in significant and continuous business activities within California, including sales to residents of this judicial district through the Internet.

5.      This Court has personal jurisdiction over Defendant Legend Footwear, Inc. d/b/a Wild Diva ("Wild Diva") because, on information and belief, Wild Diva is a California corporation with its principal place of business located at 19445 E. Walnut Drive North, City of Industry, CA 91789; conducts business in the judicial district; and has deliberately engaged in significant and continuous business activities within California, including sales to residents of this judicial district through the Internet.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims set forth herein occurred in California through at least Defendants' unauthorized use of the Asserted Trademarks in commerce in California.  The Asserted Trademarks are described below.

## **THE PARTIES**

7.      Plaintiff Crocs, Inc. ("Crocs") is a Delaware corporation with its principal place of business located at 13601 Via Varra in Broomfield, CO 80020.

8.      On information and belief, Defendant La Modish is an unincorporated business with its principal place of business at 1773 W. San Bernardino Rd., Suite B25, West Covina, CA 91790.

9.      On information and belief, Defendant Wild Diva is a California corporation with its principal place of business located at 19445 E. Walnut Drive North, City of Industry, CA 91789.

## GENERAL ALLEGATIONS

### I.   THE ASSERTED TRADEMARKS

10.     Crocs owns valuable trademarks.  These trademarks include Crocs's iconic design marks, which are federally registered as U.S. Trademark Registration No. 5,149,328 ("the '328 Registration) (Exhibit 1) and U.S. Trademark Registration No. 5,273,875 (the '875 Registration) (Exhibit 2), and they also include a common law trademark on the vamp of the shoe (the "Vamp Mark") (the '323 Registration, the ''875 Registration, and the Vamp Mark, collectively, "the 3D Marks" or the "Crocs 3D Marks"). Crocs's trademarks also include the word mark "CROCS", which is registered as U.S. Trademark Registration No. 3,836,415 ("the '415 Registration", "the Word Mark", or "the Crocs Word Mark") (Exhibit 3) (the 3D Marks and Word Mark collectively, the "Asserted Trademarks").   Where appropriate, the Vamp Mark is differentiated from the three "Registered Trademarks."

11.     The Word Mark is on the Principal Register of the United States Patent and Trademark Office ("PTO"), and the '328 and '875 Registrations are on the PTO's Principal-2(F) register.

**A.     The Crocs 3D Marks and Crocs Word Mark**

12.     The Crocs 3D Marks consist of a three-dimensional configuration of the outside of an upper for a shoe, featuring holes placed across the horizontal portion of the upper.  In addition, the '328 and '875 Registrations have a textured strip along the vertical portion of the upper having openings. Furthermore, the design of the '875 Registration also depicts a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap. The 3D Marks were first used in Commerce in June 2003. Images of these marks are reproduced below, with the Vamp Mark found on the horizontal portion of the upper for both figures:[1]

**FIGURE 1: Representative Images of Crocs 3D Marks**

| Registration No. 5,149,328 | Registration No. 5,273,875 |
| --- | --- |
|  |  |

---

[1] These images are reproduced several times in this Complaint.  For the sake of convenience, the Vamp Mark is not provided as a separate diagram.

13.     The Word Mark encompasses several standard character marks for "CROCS", which are registered for use in footwear and in lightweight, slip-resistant footwear specifically. The Word Mark was first used in November 2002.

14.     Neither the 3D Marks nor the Word Mark were subject to a prior registration or unsuccessful registration.

### 1.     The Crocs 3D Marks and Crocs Word Mark

15.     As set forth below, the Asserted Trademarks are widely recognized by the general consuming public of the United States as a designation of origin of the footwear products that are manufactured, sold, distributed, and promoted by Crocs. In particular, the Asserted Trademarks are widely publicized both by Crocs and third parties; products bearing the Asserted Trademarks are sold extensively throughout the United States; the Asserted Trademarks are widely recognized by the consuming public; and the Asserted Trademarks enjoy federal trademark registration.

#### a.     Crocs Distributes Shoes Bearing the Asserted Trademarks Through Many Different Channels and Market Segments

16.     Crocs distributes its iconic footwear through a vast network of domestic distribution channels, including major retailers and department stores such as Nordstrom, Journeys, Foot Locker, Finish Line, Urban Outfitters, Shoe Carnival, Designer Shoe Warehouse, and Famous footwear; sporting good and outdoor retailers such as REI, Dick's Sporting Goods, and Academy Sports; and online retail

outlets like Zappos.com, Shoes.com, and Amazon.com. Crocs also distributes its footwear through various and sundry specialty channels, including gift shops, collegiate bookstores, uniform suppliers, independent bicycle dealers, specialty food retailers, and health and beauty stores. Crocs footwear is available for sale in countless store locations domestically, and in over 90 countries worldwide. In addition, Crocs sells its footwear through its website, www.crocs.com, and in Crocs' own retail stores all over the world.

17.    Crocs' iconic Classic Clog was conceptualized during a sailing trip and originally presented to consumers as a boat shoe. Soon after, it became apparent that the shoe appealed to consumers of all demographics seeking fun and friendly, comfortable footwear. By 2005, the Crocs shoe reflected in the Crocs 3D Marks had become recognized as a new standard-bearer in the fashion footwear, professional footwear, and casual lifestyle footwear markets.

18.    Figure 2 highlights how the Classic Clog incorporates the 3D Marks:

**FIGURE 2: Representative Images of Crocs 3D Marks with the Classic Clog**

| Registration No. 5,149,328 | Registration No. 5,273,875 | The Classic Clog |
|---|---|---|

19.     For the past two decades, Crocs has produced footwear, including the Classic Clog, that bears the Crocs 3D Marks and the Crocs Word Mark. These footwear products are marketed for men, women, and children of all ages. Crocs' customers come from all backgrounds, occupations, education and income levels, and geographic regions in the United States.

20.     Through unconventional collaborations with different brands, celebrities, and artists, the Classic Clog continues to reach diverse and specific psychographic market segments as the shoe is regularly repackaged into new footwear models bearing the Crocs 3D Marks and Word Mark. The list of these partnerships includes modern pop artists like Justin Bieber and Post Malone, Los Angeles high-fashion apparel brands Pleasures and Chinatown Market, the luxury department store Barney's New York, and fast-food chain KFC.

21.     Shoes bearing the Crocs Word Mark are equally ubiquitous across different market segments, if not more so, since they include the clog-like shoes embodied in the Crocs 3D Marks, as well as each and every variation thereof that is produced and sold by Crocs. The Crocs Word Mark is thus featured on all types of footwear, including boots, flip-flops, sneakers, flats, platforms, sandals, wedges, and slides.

22.     The Crocs Word Mark and Crocs 3D Marks also appear in footwear marketed and sold to specific occupational groups, such as the restaurant, hospitality,

and healthcare industries. The rise in stay-at-home workers caused by the COVID-19 pandemic has created additional market reach into occupational segments, as working professionals have sought out comfortable, casual footwear for use during the remote workday at home.

23.     Finally, Crocs has generated substantial revenue from the sales of its footwear products bearing the Asserted Trademarks.  Over the past three calendar years, for example, Crocs has sold millions of pairs of shoes bearing the Asserted Trademarks in the United States alone, corresponding to hundreds of millions of dollars in revenue.

> **b.**     **The Crocs Asserted Trademarks Receive Substantial Publicity and the Marks Are Widely Recognized by the Consuming Public**

24.     Since its debut, Crocs footwear bearing the Crocs 3D Marks and Crocs Word Mark has received substantial publicity. By 2006, the Classic Clog had already morphed into "a global phenomenon" thanks to its distinctive look. And that same year, the company's success was recognized with a marketing award for garnering more than 800 million editorial impressions.

25.     Notwithstanding marketing efforts, the design of the iconic Crocs footwear, which is depicted in the Crocs 3D Marks, is itself responsible for generating much of the publicity that Crocs receives. Its unusual and distinctive appearance caused an uproar in the fashion footwear world, and it has made the

classic Crocs shoe a source of unending debate. The footwear even inspired an anti-Crocs movement on social media with millions of followers, and an "I Hate Crocs" blog, which sold its own anti-Crocs merchandise. Public figures caught wearing Crocs shoes in public have helped to keep the media spotlight trained on shoes bearing the Crocs 3D Marks and Crocs Word Mark. President George W. Bush made international news when he was seen wearing a pair of Classic Clogs. Former First Lady Michelle Obama also drew international attention when she was spotted in shoes with heels bearing Crocs Trademarks. And in the United Kingdom, Prince George caused Crocs footwear sales to skyrocket after he wore a pair of Crocs bearing the Crocs Trademarks.

26.     Other celebrities have also kept attention on Crocs by wearing the shoes in public, including television and movie stars like Jack Nicholson, Whoopi Goldberg, John Cena, Shia LaBeouf, Jennifer Garner, and Sacha Baron Cohen, and famous musicians like Ariana Grande, Post Malone and Justin Bieber.

27.     The Crocs 3D Marks and Crocs Word Mark receive substantial publicity on social media, too. For example, a viral video "Crocs Shaving Cream Challenge" has led to hundreds of thousands of online videos consisting of "filling a Crocs shoe with shaving cream and then jamming your foot in." Similarly, a viral six-second video of a grandmother wearing the classic Crocs shoe has received tens of millions of views. In addition to these viral videos, an almost infinite number of

memes featuring the Crocs shoe have spread across different social media platforms, a trend which even Crocs itself has embraced. Indeed, the Classic Clog garnered nearly 25 billion observed media impressions in 2020 alone.

### c.   The Asserted Trademarks Are Federally Registered

28.   Two of the Crocs 3D Marks were federally registered on February 28, 2017 as U.S. Trademark Registration No. 5,149,328, and on August 29, 2017 as U.S. Trademark Registration No. 5,273,875.   The Vamp Mark is a common law trademark.

29.   The Crocs Word Mark was federally registered on August 24, 2010, as U.S. Trademark Registration No. 3,836,415 (renewed October 4, 2019).

### 2.   The Crocs 3D Marks Are Not Functional

30.   They 3D Marks feature one-of-a-kind ornamental design characteristics that give the overall impression of a fun and distinctively quirky clog-like shoe for which Crocs is well-known. The distinctively gentle slope of the upper gives the shoe a unique, recognizable outline.

31.   Given the virtually infinite number of different, non-infringing footwear styles in existence today, and which are available to other footwear companies, Crocs' competitors do not have any actual competitive need to use the Crocs 3D Marks in commerce.

32.    As explained in greater detail below, the Crocs 3D Marks are intentionally and frequently copied, not due to competitive need, but because of the significant goodwill that the Crocs 3D Marks have accumulated over the past two decades during their use by Crocs.

**B.    Crocs Licenses the Asserted Trademarks**

33.    Crocs has only licensed the Asserted 3D Marks on one occasion, and thus has an especially keen interest in protecting them from the kind of confusion and dilution that occurs from the unlicensed use of its marks by knockoffs that are labeled with the name of the knockoff's manufacturer. Crocs has not licensed the Word Mark.

34.    Specifically, in 2017 Crocs unveiled a licensing partnership with famed footwear designer Balenciaga. These shoes retailed for $850, and were described as one of the "hottest trends" of 2018 by Business Insider.

35.    The Balenciaga/Crocs cross-over shoe was a smashing success: the shoes sold out during pre-release before they were even officially available for purchase. They were offered on e-commerce sites including Barneys New York. *Id.*

36.    The cross-over shoes incorporate the 3D Marks. Notably, the shoes feature round holes placed across the horizontal portion of the upper, and a textured strip along the vertical portion of the upper having trapezoidal openings. In addition to these features, the shoes also have a textured strip on the heel of the shoe, and a

decorative band along the length of the heel strap, as contemplated by the '875 Registration. A representative image of these shoes are shown below:



37.     A close-up of the shoe reveals Balenciaga's name on the button connection the heel strap to the body of the shoe, which replaces the usual Crocs logo found in the same spot:



38.   Other configurations of the shoe included Balenciaga's name as a shoe charm:



## II.   Plaintiff Crocs

### A.   History of Crocs

39.   Crocs was founded in 2002 by three college friends and innovators who shared a love for sailing. That year, co-founder Scott Seamans saw a shoe developed and manufactured by Canadian company Foam Creations, Inc. He came up with the idea to add a foam strap to the shoe, and the Classic Clog was born. He and his friends George Boedecker and Lyndon "Duke" Hanson embarked on a Caribbean

sailing trip on a quest to perfect the shoe and, by November 2002, Crocs had sold its first thousand pairs of shoes. After expanding domestic distribution and production capacity, Crocs acquired Foam Creations in June 2004. Around that time, Crocs also added warehouses and shipping programs for speedy assembly and delivery.

40.    Crocs launched its first national marketing campaign in 2005 after partnering with a local Colorado advertising firm. The campaign played on the distinctively quirky design elements of the clog-like shoe that is embodied in the Crocs 3D Marks, and across the country, it spread the company's message that "Ugly Can Be Beautiful."

41.    Continuing in an upward trajectory, Crocs began to lay the foundation for an Initial Public Offering ("IPO"). The company turned a net profit of $16.7 million for 2005, and was named "Brand of the Year" by Footwear News. Then, in 2006, Crocs launched the largest footwear IPO in history, raising approximately $208 million in its 9.9 million-share offering.

42.    The 2008 economic downturn impacted Crocs as hard as it did any other company. It was not until 2011 that Crocs saw its first rebound, when it opened hundreds of new stores and reported sales of $1 billion worldwide for the first time in its history.

43.    Building on this success, the company implemented a return to the basics that relied on the goodwill it had established around the Crocs 3D Marks and

Crocs Word Mark over the past decade by reintroducing the Classic Clog with attention-grabbing celebrity partnerships and a fresh ad campaign that acknowledged the company's detractors. The new "Come As You Are" campaign invited footwear shoppers to be themselves, and to recognize the false choice between comfort and style by embracing quirky, clog-like foam shoes.

44.     During the past few years, Crocs has seen continued and steady sales growth as a result of its revitalization. In 2020, the largest global fashion search platform, Lyst, reported that, based on web searches, the Classic Clog that is embodied in the Crocs 3D Marks was the eighth most wanted item in the world. The New York Times declared that "Crocs Won 2020," and fashion bloggers predicted that "2021 will be the Year of the Croc."

45.     The sale of footwear bearing the Crocs 3D Marks and Crocs Word Mark is responsible for the edification of Crocs as an institution in the footwear industry, and the goodwill built into these marks that continue to carry the company to greater heights.

**B.     Crocs Footwear**

46.     Today, Crocs footwear can be found in hundreds of forms and color patterns, ranging from khaki canvas loafers to tie-dyed sandals. Among this wide variety of options, the Classic Clog that features the Crocs 3D Marks, as well as the Crocs Word Mark, remains the company's flagship shoe.

47.     Crocs has produced multiple lines of footwear that embody both the Crocs 3D Marks and the Crocs Word Mark, beginning with the classic "Beach" model when the company first launched. The "Beach" Crocs shoes were soon after followed by the "Cayman", "Metro" and "Bistro" lines that also reflect one or more of the Crocs Marks. As the brand's forebearers, these shoes in particular have inspired countless imitations.

48.     The Crocs Word Mark appears on all of its shoe models and the Crocs 3D Marks are also reflected in numerous Crocs styles and models, including at least the following current footwear, each of which may include multiple models: Classic Clog (including Bae, Platform and All-Terrain models), Baya Clog, Freesail Clog, and Crocs Littles Clog.

**C.     Crocs Vigorously Defends its Intellectual Property, Including its 3D Marks and Word Mark**

49.     Crocs devotes significant time and resources to stopping infringement of its 3D Marks and Word Mark. Its enforcement actions are diverse and multi-faceted, ranging from full litigation to educational outreach depending on what is warranted by the circumstances.

50.     The scale of this infringement requires constant attention. Each year, enforcement officials around the world, including authorities in the United States, seize hundreds of thousands of shoes that improperly bear the Crocs 3D Marks

and/or Word Mark. For many of these products, the United States is the intended final destination. In more recent years, the rise in consumer online shopping has enabled the sale of infringing footwear on an unprecedented scale. For example, in 2018, Crocs' defense efforts resulted in the termination of over 70,000 online auctions for infringing products, and the shutdown of over 1,500 websites, in the United States alone.

51.     Crocs works with various third-party agencies to monitor and eradicate the infringing use of the 3D Marks and Word Mark. One such agency Crocs has used is MarkMonitor, which monitors websites around the world for unauthorized or improper use of Crocs' trademark in their website content; the use of the Crocs brand in a domain name to redirect traffic to websites containing sponsored links or product listing for footwear sold by other companies; or web articles containing the Asserted Trademarks that are used to drive traffic to paid links.

## III.   Defendants

52.     On information and belief, Defendants are manufacturers, distributors and/or retailers that use the Asserted Trademarks in commerce without Crocs' permission in a manner that is detrimental to Crocs and the goodwill and reputation Crocs enjoys with consumers.

53.     The particular Asserted Trademarks that each Defendant has violated or is violating is set forth in Table 1 below:

**TABLE 1: Asserted Trademarks Violated by Defendants' Accused Products**

| Defendant's Accused Products | U.S. Trademark Registration No. 5,149,328 (The 3D Mark) | U.S. Trademark Registration No. 5,273,875 (The 3D Mark with the textured heel and Decorative Band) | The Vamp Mark | The CROCS Word Mark |
|---|---|---|---|---|
| La Modish's "Brandy Slides" and "Lindsey Crocs" | X | X | X | X |
| Wild Diva's "Tomika" | X | X | X | |

### A.    La Modish

54.    On information and belief, La Modish Boutique ("La Modish") is an unincorporated business with a principal place of business located at 1773 W San Bernardino Rd, Suite B25, West Covina, CA 91790. On information and belief, La Modish is owned and operated primarily by Patricia Lorena Guevara, a resident of California.

### 1.    La Modish's Background

55.    On information and belief, La Modish is an e-commerce business that focuses primarily on selling a variety of women's footwear products. These products are sold primarily through the website lamodishboutique.com. On information and belief, this website is owned and operated by La Modish.

### 2.    La Modish's Accused Products

56.    La Modish's Accused Products include at least its "Brandy Slides" and "Lindsey Crocs" footwear products and colorable imitations thereof.

57.    Representative images of La Modish's Accused Products are shown below—the shoe charms in the holes of the horizontal portion of the upper are removable:

 

58.    On information and belief, La Modish has promoted and sold additional shoe models bearing the 3D Marks under various names and style descriptions.

59.    The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

### 3. La Modish's Unfair Acts, Infringement, and Dilution of Crocs' 3D Marks

60.     La Modish manufactures, imports into the United States, promotes, distributes, and/or sells after importation in the United States La Modish's Accused Products.

61.     For the reasons set forth below, La Modish's Accused Products infringe and are likely to dilute Crocs 3D Marks.

### a. Crocs Owned Protectable and Famous Trademark Rights Before La Modish Promoted and Sold Accused Products

62.     On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, La Modish began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

63.     The '328 Registration and '875 Registration relevant to La Modish's violations are also the subject of duly issued United States Trademark Registrations.

### b. La Modish's Accused Products Are Likely to Cause Confusion with the Crocs' 3D Marks

64.     The Asserted 3D Marks relevant to La Modish's violations are also the subject of a duly issued United States Trademark Registration.

65.     As shown in Figure 3 below, La Modish's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the

size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products is confusingly similar to the 3D Marks. In addition, the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 3: Representative Images of La Modish's Accused Products and the Crocs Asserted Trademarks**



| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|

### c.    La Modish Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks

66.    La Modish's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between La Modish's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to La Modish's intentional copying. La Modish's copying is also evidenced by its use of the Crocs Word Mark, as detailed below.

> ### d.  La Modish Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks

67.     On information and belief, La Modish promotes and sells its Accused Products primarily online through its own website, lamodishboutique.com.

68.     On information and belief, La Modish's Accused Products have been promoted and sold for approximately $35.

69.     On information and belief, La Modish promotes and sells its Accused Products as a casual or lifestyle shoe primarily to women.

> ### e.  Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by La Modish's Accused Products

70.     Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of La Modish's Accused Products when confronted with promotions and sales of La Modish's Accused Products.

71.     Further, in the post-sale context, where actual or potential consumers of shoes may only see La Modish's Accused Products on someone's feet in passing, consumers are also likely to mistake the source, affiliation, or sponsorship of La

Modish's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

**f.  La Modish's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

72.  Due to the overwhelming similarities between La Modish's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between La Modish or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

**4.  La Modish's Unfair Acts, Infringement, and Dilution of the Crocs Word Mark**

73.  La Modish manufactures, imports into the United States, promotes, distributes, and/or sells after importation in the United States La Modish's Accused Products referenced above.

74.  For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs Word Mark.

**a.  Crocs Owned Protectable and Famous Trademark Rights Before La Modish Promoted and Sold Accused Products**

75.  On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, La Modish began promoting and selling the Accused Products after the Word Mark was registered and became well-recognized and famous.

76.     The Asserted Word Mark relevant to La Modish's violations is also the subject of a duly issued United States Trademark Registration.

**b.     La Modish's Use of the Word Mark in Connection with its Sale of the Accused Products Is Likely to Cause Confusion with the Crocs Word Mark**

77.     La Modish uses the Crocs Word Mark in connection with the marketing and sale of goods on its website. La Modish uses the Crocs Word Mark both with respect to the names of its Accused Products and the marketing materials through which it sells the products.

78.     For example, La Modish uses the Word Mark "CROCS" with respect to the marketing and sale of its "Lindsey Crocs" footwear products. La Modish uses the Word Mark both for the name of its shoe, as well as in the "Product Details" section of the webpage on which it lists the shoe for sale, where it describes the shoe as being made of "Croc Material." A screenshot of this webpage is presented below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14




15
16    79.    Similarly, La Modish uses the Word Mark "CROCS" with respect to
17   the marketing and sale of its "Brandy Slides" footwear products. It does so in the
18   "Product Details" section of the webpage on which it lists the shoe for sale, where it
19   describes the shoe as being made of "Croc Material." A screenshot of this webpage
20   is presented below:
21
22
23
24
25
26
27
28



80.    La Modish's use of this Word Mark is likely to cause confusion among consumers, who are likely to mistakenly believe that Complainant is the source of these Accused Products.

**c.    La Modish Intended to Copy the Crocs Word Mark and to Infringe and Dilute the Crocs Word Mark**

81.    La Modish's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from their use of the word "CROCS" to sell footwear products. La Modish is using the exact Word Mark without alteration. On

information and belief, this was intentionally done to copy Complainant's Word Mark.

### d. La Modish Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sale of Products Bearing the Asserted Trademarks

82. On information and belief, La Modish promotes and sells its Accused Products online through its own website, lamodishboutique.com.

83. On information and belief, La Modish's Accused Products have been promoted and sold for approximately $35.

84. On information and belief, La Modish promotes and sells its Accused Products as casual or lifestyle shoes primarily for women of all ages.

### e. Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by La Modish's Accused Products

85. Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest and at the point of purchase. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of La Modish's Accused Products when confronted with promotions and sales of La Modish's Accused Products.

### f. La Modish's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs Word Mark

86.     For the reasons set forth above and due to La Modish's outright copying of the Crocs Word Mark, there is (a) a likelihood of confusion between La Modish or its Accused Products, and Crocs or the Crocs Word Mark, and/or (b) a likelihood of dilution between the same.

### B. Legend Footwear, Inc. d/b/a/ Wild Diva

87.     On information and belief, Legend Footwear, Inc. d/b/a Wild Diva ("Wild Diva") is a California Corporation with its principal place of business located at 19445 E. Walnut Drive North, City of Industry, CA 91789.

### 1. Wild Diva's Background

88.     On information and belief, Wild Diva is a footwear brand that describes itself as a "branched out division of the pioneer 'Legend Footwear Inc.'"

89.     Wild Diva sells its products, including the Accused Products described below, directly through its website, wilddiva.com. On information and belief, Wild Diva further sells Accused Products through retailers, that in turn sell Accused Products online and through brick-and-mortar stores.

### 2.   Wild Diva's Accused Products

90.     Wild Diva's Accused Products include at least its "Tomika" footwear products and colorable imitations thereof. Representative images of Wild Diva's Accused Products are shown below:







91.     The Accused Products are manufactured abroad and are imported into the United States. Specifically, and as seen in the pictures above, the shoes have a label stating "Made in China."

### 3. Wild Diva's Unfair Acts, Infringement, and Dilution of the Crocs 3D Marks

92.   Wild Diva manufactures, imports into the United States, promotes, distributes, and/or sells after importation in the United States Wild Diva's Accused Products.

93.   For the reasons set forth below, these Accused Products infringe and are likely to dilute Crocs' 3D Marks.

### a. Crocs Owned Protectable and Famous Trademark Rights Before Wild Diva's Promoted and Sold Accused Products

94.   On information and belief, based on the extensive monitoring performed on Crocs' behalf described above, Wild Diva began promoting and selling the Accused Products after the Asserted Registered Trademarks were registered and became well-recognized and famous, and after the Vamp Mark was first used in commerce.

95.   The '328 Registration and '875 Registration relevant to Wild Diva's violations are also the subject of a duly issued United States Trademark Registration.

### b. Wild Diva's Accused Products are Likely to Cause Confusion with the Crocs' 3D Marks

96.   As shown in Figure 4 below, Wild Diva's Accused Products bear designs that are likely to cause confusion with the Crocs 3D Marks. In particular, the size, positioning, number, and shape of the holes on the horizontal portion of the upper of the Accused Products is confusingly similar to the 3D Marks. In addition,

the Accused Products have a textured strip along the vertical portion of the upper with trapezoidal openings, which further contributes to the likelihood of consumer confusion. The Accused Products further have a textured strip on the heel of the shoe, and a decorative band along the length of the heel strap.

**FIGURE 4: Representative Images of Wild Diva's Accused Products and the Crocs Asserted Trademarks**

| Accused Products | Registration No. 5,149,328 | Registration No. 5,273,875 |
|---|---|---|

         **c.**     **Wild Diva Intended to Copy the Crocs 3D Marks and to Infringe and Dilute the Crocs 3D Marks**

97.    Wild Diva's intent to create associations with Crocs and to free ride on Crocs' goodwill is evident from at least the close similarities between Wild Diva's Accused Products on the one hand, and the famous Crocs 3D Marks on the other hand. On information and belief, the overwhelming similarities are due to Wild Diva's intentional copying.

1
2
3

    **d.**     **Wild Diva Promotes and Sells Accused Products in Competition with Crocs' Promotion and Sales of Products Bearing the Asserted Trademarks**

4
5
6
7
8

98.    On information and belief, Wild Diva promotes and sells its Accused Products through its own website, wilddiva.com, as well as through other online retailers such as Shoenami.net. On information and belief, Wild Diva has also sold its Accused Products through various other retail stores and Internet sites.

9
10
11

99.    On information and belief, Wild Diva promotes and sells its Accused Products as casual or lifestyle shoes primarily for people of all ages.

12
13

100.    On information and belief, Wild Diva's Accused Products have been promoted and sold for approximately $35.

14
15
16

    **e.**     **Relevant Consumers Are Susceptible to Confusion and Dilutive Associations Caused by Wild Diva's Accused Products**

17
18
19
20
21
22
23
24

101.    Consumers of shoes like those at issue here are not likely to exercise great care in resolving likely confusion in their initial product interest, at the point of purchase, or in post-sale exposure. Even more sophisticated consumers are likely to experience cognitive dissonance regarding the source, affiliation, sponsorship, or association of Wild Diva's Accused Products when confronted with promotions and sales of Wild Diva's Accused Products.

25
26
27

102.    In the post-sale context, where actual or potential consumers of shoes may only see Wild Diva's Accused Products on someone's feet in passing,

28

consumers are also likely to mistake the source, affiliation, or sponsorship of Wild Diva's Accused Products with Crocs and/or the Asserted Trademarks, or to associate the Accused Products with Crocs and/or the Asserted Trademarks.

> **f.    Wild Diva's Accused Products Are Likely to Cause Confusion and Dilutive Associations with Crocs or the Crocs 3D Marks**

103.   Due to the overwhelming similarities between Wild Diva's Accused Products and the Crocs 3D Marks, and for the reasons set forth above, there is (a) a likelihood of confusion between Wild Diva or its Accused Products, and Crocs or the Crocs 3D Marks, and/or (b) a likelihood of dilution between the same.

## COUNT I: TRADEMARK INFRINGEMENT UNDER SECTION 32(1) OF THE LANHAM ACT (15 U.S.C. § 1114(1)) (AGAINST ALL DEFENDANTS)

104.   Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

105.   As alleged more fully herein, the USPTO has granted Crocs federal trademark registrations for Registered Trademarks Nos. 3,836,415; 5,149,328; and 5,273,875, as set forth in Section I.A, *supra*.

106.   Crocs used Registered Trademarks Nos. 3,836,415; 5,149,328; and 5,273,875 in commerce before Defendants began their unauthorized uses of these three Asserted Trademarks.

107.   Defendants' unauthorized sales and attempted sales of their respective Accused Products containing Plaintiff's Registered Trademarks Nos. 3,836,415; 5,149,328; and 5,273,875, as set forth in Table 1, to unsuspecting consumers is a violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

108.   Defendants' past and continued sales of their Accused Products has created a substantial likelihood of confusion and caused mistake and deception in consumers' minds.

109.   Defendants' unauthorized use of Crocs' Registered Trademarks Nos. 3,836,415; 5,149,328; and 5,273,875, as set forth above, constitutes use in commerce, without Crocs' consent, of a reproduction, counterfeit, copy, or colorable imitation of Crocs' Registered Trademarks Nos. 3,836,415; 5,149,328; and 5,273,875 in connection with the advertisement, promotion, sale, and distribution of products and/or services. Such use is likely to cause confusion or mistake, or to deceive customers, and therefore infringes the Asserted Trademarks, in violation of 15 U.S.C. § 1114(1).

110.   As a result of Defendants' continued sale of their Accused Products, Crocs has suffered and will continue to suffer irreparable harm to its goodwill and reputation with not only its customers, who confuse the Accused Products with legitimate Crocs Products, but also with the general public, who are confused as to the source of the Accused Products after they have been sold.

111.   Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' Actions.

## COUNT II: FALSE DESIGNATION OF ORIGIN/UNFAIR COMPETITION UNDER SECTION 43(a) OF THE LANHAM ACT (15 U.S.C. § 1125(a)) (AGAINST ALL DEFENDANTS)

112.   Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

113.   Defendants' use of Crocs' Asserted Trademarks, as set forth in Table 1 and in the manner alleged herein, constitutes a false designation of origin within the meaning of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), which is likely to cause confusion, mistake, or deception as to the affiliation, connection, source, origin, authorization, sponsorship, and/or approval of Defendants' commercial activities with respect to Crocs' Asserted Trademarks.

114.   Crocs used these Asserted Trademarks in commerce before Defendants began their unauthorized uses of the Asserted Trademarks.

115.   The consuming public is likely to attribute to Crocs Defendant's use of the Asserted Trademarks as a source of origin, authorization, and/or sponsorship for the products Defendants sell and, further, purchase products from Defendants in the erroneous belief that Defendants are authorized by, associate with, sponsored by, or

affiliated with Crocs, when there is no such connection between Crocs and Defendants.

116.   Defendants' actions have been conducted intentionally and willfully, with the express intent to cause confusion and mistake, to deceive the consuming public, to trade upon the quality and reputation of Crocs, and to appropriate Crocs' valuable trademark rights.

117.   Defendants' conduct has deceived, and is likely to continue to deceive, a material segment of the consumers to whom they have directed their marketing activities.

118.   As a result of this misconduct, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public, who are confused as to the source of the Accused Products after they have been sold.

119.   Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' Actions.

### COUNT III - TRADEMARK DILUTION UNDER SECTION 43(c) OF THE LANHAM ACT (15 U.S.C. § 1125(c)) (AGAINST ALL DEFENDANTS)

120.   Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

121.   The Crocs Registered Trademarks are "famous" as defined in 15 U.S.C. § 1125(c). Defendants' use of these marks constitutes a use of these famous trademarks in commerce.

122.   Crocs used these Registered Trademarks in commerce—and those Registered Trademarks became famous—before Defendants began their unauthorized uses of the Registered Trademarks.

123.   The Registered Trademarks are widely recognized by the general consuming public of the United states as designations of source of goods and services. As set forth above, the Crocs Registered Trademarks are widely recognized in the United States and around the world, and consumers instantly recognize the connection between Plaintiff and these famous marks.

124.   Defendants' sales and offers for sale of their respective Accused Products violate Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). The Defendants do so intentionally and maliciously. This has the effect of diluting the distinctive quality of Crocs' Registered Trademarks, as well as tarnishing the good will consumers associate with Crocs' Registered Trademarks.

125.   As a result of this misconduct, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public, as Defendants' conduct lessens the value of the Registered Trademarks as identifiers of Crocs' goods and services.

126.   Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' Actions

## COUNT IV - VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAWS (CAL. BUS. & PROF. CODE §§ 17200, *et seq.*) (AGAINST ALL DEFENDANTS)

127.   Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

128.   The Crocs 3D Marks acquired substantial secondary meaning and became famous or otherwise well-recognized in the marketplace before Respondents commenced their unauthorized uses of the Crocs 3D Marks in connection with the Accused Products.

129.   The Crocs Word Mark is Arbitrary and is therefore inherently distinctive. It became famous or otherwise well-recognized in the marketplace before Respondents commenced their unauthorized uses of the Crocs Word Mark in connection with the Accused Products.

130.   All the Asserted Trademarks have become a single source identifier distinctly associated with Plaintiff.

131.   Defendants' use of the Asserted Trademarks has or will likely cause confusion in the minds of consumers familiar with Crocs' Asserted Trademarks. In particular, Defendants use the Asserted Trademarks for casual footwear products,

which is how Crocs uses the Asserted Trademarks. Accordingly, consumers of Crocs' Asserted Trademarks will be deceived or confused, or will otherwise be mistaken, as to the source of the business in question when they encounter Defendants' Accused Products.

132.   In addition, Defendants have traded off of Crocs' popularity and goodwill in marketing, selling and profiting from the sale of their Accused Products.  Defendants' Accused Products have caused, and are likely to cause in the future, impairment of the distinctiveness of the Asserted Trademarks due to association by consumers with Defendants' similar marks and trade names. Similarly, the reputation of Crocs' Asserted Trademarks has been harmed, and is likely to be harmed in the future, through its association with Defendants' similar marks and trade names, which occurs as a result of the promotion and sale of the Accused Products. This confusion and dilution diminish, or threaten to diminish, the capacity of the Asserted Trademarks to distinguish Crocs goods, constituting substantial present and likely future harm to Crocs, including economic harm in the form of lost profits and diminishment of brand equity.

133.   Defendants' use of Crocs' Asserted Trademarks, as set forth in Table 1 and in the manner alleged herein, constitute unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California's Unfair Competition Laws.  Defendants' acts or business practices are

unlawful and fraudulent for numerous reasons as alleged herein, including, but not limited to, that they constitute infringement, misappropriation, and conversion of the Asserted Trademarks to gain an unfair competitive advantage in the marketplace. Defendants' acts or business practices are unfair for numerous reasons as alleged herein, including, but not limited to, that they violate California's public policy against unjust enrichment at the expense of another, and the injury is not outweighed by any countervailing consumer or competitive benefits of those acts or practices.

134.   As a result of this misconduct, and other instances of unfair competition that Defendants have engaged in, Crocs has suffered, and will continue to suffer, irreparable harm to its goodwill and reputation with both its customers and the general public.

135.   Crocs has no adequate remedy at law for this immediate and continuing harm. Crocs has been, and absent injunctive relief will continue to be, irreparably harmed by Defendants' unlawful, unfair, and/or fraudulent acts or business practices.

### COUNT V - COMMON LAW TRADEMARK INFRINGEMENT (CALIFORNIA COMMON LAW) (AGAINST ALL DEFENDANTS)

136.   Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

137.   Defendants' actions and conduct, including their unauthorized use of the Asserted Trademarks and past and continued sales of their Accused Products, constitute trademark infringement in violation of California common law.   As alleged herein, Defendants have manufactured, marketed, promoted, distributed, offered for sale, and/or sold products using the Asserted Trademarks.  As a result of the past and continued sales of their Accused Products, Defendants have created a substantial likelihood of confusion and caused mistake and deception in consumers' minds.

138.   Defendants' unauthorized use of Crocs' Asserted Trademarks, as set forth above, falsely represents Defendants' products as originating with, emanating from or being authorized by Crocs.  As a result of Defendants' unauthorized use of Crocs' Asserted Trademarks, Crocs has suffered and will continue to suffer irreparable harm to its goodwill and reputation with the public and consumers, and undermine Crocs's ability to develop and promote its products and to have its products associated exclusively with Crocs.

139.   As a result of the unauthorized conduct described above, Defendants have enjoyed unjust profits and gains in the marketplace while causing Crocs to suffer substantial damages.  Accordingly, Crocs is entitled to recover any and all profits that Defendants have made from their unauthorized use of the Asserted Trademarks and unauthorized sales of the Accused Products.

140.   Due to the immediate and ongoing nature of the harm, for which Crocs has no adequate remedy at law, Crocs is further entitled to injunctive relief to prevent the continuing irreparable harm caused by the unauthorized actions of Defendants as described above.

### COUNT VI - UNFAIR COMPETITION (CALIFORNIA COMMON LAW) (AGAINST ALL DEFENDANTS)

141.   Crocs hereby reasserts the allegations set forth in the preceding paragraphs and incorporates them by reference.

142.   Defendants' unauthorized use of the Asserted Trademarks and past and continued sales of their Accused Products constitute unfair competition in violation of California common law.  As a result of these unauthorized activities, Defendants have willfully and fraudulently passed off the Accused Products as Crocs' footwear products that bear the Asserted Trademarks.  Defendants' unauthorized use of the Asserted Trademarks was calculated to deceive consumers, and had the predictable effect of deceiving consumers, about the source of the Accused Products.

143.   As described above and alleged more fully herein, the unauthorized use of the Asserted Trademarks by Defendants has caused Crocs to suffer, and will continue to cause Crocs to suffer, irreparable harm to its goodwill and reputation with both consumers and the general public.  Crocs is therefore entitled to permanent injunctive relief enjoining Defendants from using the Asserted Trademarks in

connection with the marketing or sale of any goods or services by Defendants; restitution of the unjust profits earned by Defendants from their unauthorized use of the Asserted Trademarks; an award of damages to compensate Crocs for the harm suffered as a direct and proximate result of Defendants' unauthorized activities; and punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, by reason of the foregoing, Plaintiff Crocs requests that this Court enter judgment in its favor and for relief against Defendants, and each of them, as follows:

A. That the Court enter judgment that:

1. Each Defendant has violated Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1);

2. Each Defendant has engaged in false designation of origin in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A);

3. Each Defendant has engaged in trademark dilution in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); and

4. Each Defendant has engaged in unlawful, unfair, fraudulent, and/or deceptive acts or business practices in violation of California's Unfair Competition Laws, Cal. Bus. & Prof. Code §§ 17200, *et seq*.

5. Each Defendant has engaged in trademark infringement in violation of the common law of the State of California.

6. Each Defendant has engaged in unfair competition in violation of the common law of the State of California.

B. That the Court issue a permanent injunction restraining and enjoining each Defendant, and all of its agents, servants, officers, employees, successors, and assigns, and all other persons or entities in active concert or participation with each Defendants from:

1. Selling, marketing, advertising, importing, or purchasing the Accused Products or colorable imitations thereof;

2. Using any of Plaintiff's Trademarks and/or any other confusingly similar designation, alone or in combination with other words, phrases, symbols, or designs, as trademarks, trade names, domain name components or otherwise, to market, advertise, or identify any Defendant's goods or services

3. Otherwise infringing Plaintiff's Trademarks;

4. Diluting Plaintiff's Registered Trademarks;

5. Representing or taking any other action likely to cause confusion, mistake, or deception on the part of consumers as to the source or origin of defendants' products or services or as to any authorization,

sponsorship, approval, or affiliation relationship between each Defendant and Plaintiff;

6. Unfairly competing with Plaintiff in any manner whatsoever or otherwise injuring its business reputation in the manner complained of herein; and

7. Engaging in assignments or transfers, formation of new entities or associations or utilization of any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in sub-paragraphs (1) through (6) above.

C. That the Court enter an order pursuant to 15 U.S.C. §§ 1116, 1118 requiring each Defendant, its agents, servants, officers, employees, successors, and assigns, to destroy all Accused Products or colorable imitations thereof that are in each Defendant's possession, custody, or control.

D. That the Court enter an order, pursuant to 15 U.S.C. § 1116, requiring each Defendant to file with the Court and serve upon Plaintiff within 30 days after the entry of each of the preliminary and permanent injunctions a report, in writing and under oath, setting forth in detail the manner in which each Defendant has complied with Paragraphs B and C, *supra*.

E. That the Court enter an order pursuant to 15 U.S.C. § 1117 awarding all profits received by each Defendant from the sales and revenues of any kind made as

a result of each Defendant's sales of Accused Products and colorable imitations thereof, and damages, to be determined, that Plaintiff has suffered as a result of Defendants' sales and marketing of the Accused Products and colorable imitations thereof, and that damages be awarded in an amount sufficient to deter future acts of willful infringement by Defendants.

F.  That the Court enter an order enjoining Defendants from engaging in unlawful, unfair, fraudulent, and/or deceptive acts or business practices by using the Asserted Trademarks in commerce in violation of California's Unfair Competition Laws, Cal. Bus. & Prof. Code §§ 17200, *et seq.*

G.  That the Court enter an order awarding damages and costs to the fullest extent provided for by California common law, including punitive damages.

H.  That the Court enter an order awarding Plaintiff's attorneys' fees and costs.

I.  That the Court enter an order awarding Plaintiff's pre-judgment and post-judgment interest.

J.  That the Court enter such other relief as it deems proper and just.

## **JURY DEMAND**

Plaintiff Crocs requests a trial by jury on all issues so triable.

Dated:  July 12, 2021                Respectfully submitted,

                                     ARNOLD & PORTER KAYE SCHOLER LLP

                                     By:  /s/ Michael A. Berta
                                         Michael A. Berta
                                         (Michael.Berta@arnoldporter.com)
                                         ARNOLD & PORTER KAYE SCHOLER
                                         LLP
                                         3 Embarcadero Center, 10th Floor
                                         San Francisco, CA 94111-4024
                                         Telephone:  (415) 471-3100
                                         Facsimile:  (415) 471-3400
                                         *Counsel for Crocs, Inc.*